

# UNITED STATES  DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

MARVIN WILEY                                     CIVIL ACTION

VERSUS                                           NO. 04-2378

N. BURL CAIN, WARDEN                             SECTION "T" (6)

## REPORT AND RECOMMENDATION

This matter was referred to the United States Magistrate Judge for the purpose of conducting hearings, including an evidentiary hearing, if necessary, and submission of proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases.  Upon review of the entire record, and for the following reasons, it is HEREBY RECOMMENDED that petitioner's application for federal habeas corpus relief be DISMISSED WITH PREJUDICE.

## PROCEDURAL HISTORY

On September 1, 1999, petitioner, Marvin Wiley, presently incarcerated in the Louisiana State Penitentiary located in Angola, Louisiana, was convicted, following trial by

jury, of racketeering and possession of a firearm by a convicted felon.[1]  On October 27, 1999, Wiley was adjudicated to be a multiple offender and was sentenced, in connection with his racketeering conviction, to life imprisonment without the benefit of probation or suspension of sentence.[2]  In connection with his conviction for possession of a firearm by a convicted felon, Wiley was sentenced to 15 years incarceration without the benefit of probation or suspension of sentence to be served consecutively with his life sentence.[3]  On February 16, 2001, the Louisiana First Circuit Court of Appeal issued two opinions, one affirming Wiley's convictions, *State v. Wiley*, 2000 KA 0782 (La. App. 1 Cir. 2001) (unpublished opinion),[4] and another affirming his habitual offender adjudication and sentences.  *State v. Wiley*, 2000 KA 0783 (La. App. 1 Cir. 2001) (unpublished opinion).[5]  On May 10, 2002, the Louisiana Supreme Court denied Wiley's writ application.  *State ex rel. Wiley v. State*, 815 So.2d 835 (La. 2002).

In September, 2002, Wiley filed an application for post-conviction relief,

---

[1]*See* State rec., vol. 3 of 7, p. 11.  Wiley's co-defendant, Reginald Johnson, was convicted of racketeering.

[2]*See* State rec., vol. 2 of 7, Transcript of Sentencing on Multiple Offender Bill, pp. 61, 75-77.

[3]*See* State rec., vol. 2 of 7, Transcript of Sentencing on Multiple Offender Bill, p. 77-78.

[4]A copy of the state appellate court's unpublished opinion is contained in the State rec., vol. 7 of 7, pp. 1694-1707.

[5]A copy of the state appellate court's unpublished opinion is contained in the State rec., vol. 2 of 7, pp. 88-91.

claiming that there was insufficient evidence to support his convictions.[6] The state district court denied Wiley's post-conviction application on September 11, 2002, via a handwritten notation providing: "[D]enied. Defendant fails to indicate what claims were brought on appeal. This court does not know if he raised these same issues on appeal."[7] On April 4, 2003, the Louisiana First Circuit Court of Appeal likewise denied Wiley relief. With regard to Wiley's claim that there was insufficient evidence to support his conviction for being a felon in possession of a firearm, the state appellate court, citing La.C.Cr.P. art. 930.4(A), denied relief based upon the fact that the claim was "raised in relator's appeal and fully reviewed by this court." The court denied Wiley's insufficient evidence claim in relation to his racketeering conviction based upon his failure to "attach the necessary documentation ... to fully review the merits...."[8] Finally, on May 14, 2004, Wiley's writ application was denied by the Louisiana Supreme Court. *State ex rel. Wiley v. State*, 872 So.2d 517 (La. 2004).

Wiley filed the instant action for federal habeas corpus relief on July 26,

---

[6]A copy of petitioner's post-conviction application is contained in the State rec., vol. 7 of 7, pp. 1933-1976.

[7]*See* State rec., vol. 7 of 7, p. 1977. As reflected in this court's earlier Order (rec. doc. 8), Wiley did not, on direct appeal, raise an insufficiency of evidence claim in connection with his racketeering conviction. Wiley did, however, on direct appeal, challenge the sufficiency of the evidence in connection with his firearm possession conviction and he challenged the trial court's ruling allowing "other crime" evidence.

[8]A copy of the Louisiana First Circuit's opinion is contained in the State rec., vol. 7 of 7, p. 1995.

2004.[9] In his habeas application, Wiley raises the following claims: 1) There was insufficient evidence to support his convictions; 2) the trial court erred in denying his motions to suppress; and, 3) the trial court erred in allowing evidence of other crimes. The State concedes that the instant action is timely.[10] Further, it has been established that Wiley, as required under *Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982), has exhausted his state court remedies.[11] Accordingly, the court shall proceed to address the merits.

## FACTS[12]

On June 20, 1997, Lt. Glenn Davis, an employee of the Jefferson Parish Sheriff's Office in charge of the interdiction or drug unit at New Orleans International

---

[9]Under the "mailbox rule" employed by this court, a pleading filed by a prisoner acting *pro se* is considered to be filed, for prescriptive purposes, on the date it is delivered to prison officials for mailing, rather than the date it is received by the court. *Cooper v. Brookshire*, 70 F.3d 377, 379 (5th Cir. 1995). If no evidence exists as to the date the petition was delivered to prison officials, the date the petitioner signed his habeas application is considered to be the filing date for purposes of determining the timeliness of the matter. *See Colarte v. Leblanc*, 40 F.Supp.2d 816, 817 (E.D. La. 1999); *Magee v. Cain*, 2000 WL 1023423, *4 n.2 (E.D. La. 2000); *Punch v. State*, 1999 WL 562729, *2 n.3 (E.D. La. 1999).

[10]*See* Federal rec., doc. 5, State's Response at p. 5.

[11]*See* Federal rec., doc. 8.

[12]The facts are based upon this court's review of the trial transcript and the Louisiana First Circuit's unpublished decision, *State v. Wiley*, 2000 KA 0782, a copy of which is contained in the State rec., vol. 7 of 7, pp. 1694-1707.

Airport,[13] observed Wiley and Shenikqual Wilson in the airport. Wilson purchased a one-way airline ticket to Los Angeles, a city known for narcotics distribution. She used cash money in small denominations to buy the ticket. Wilson had in her possession a small carry-on bag which she placed on the counter to be checked onto the plane. Wiley, who remained standing in the ticket line while Wilson purchased the ticket, instructed her not to check the bag, but to carry it on with her.

Davis and his partner positioned themselves at the security checkpoint near the concourse where Wilson's plane was to depart. As Wiley and Wilson approached the checkpoint, Wiley noticed the two officers standing at the checkpoint. Wiley made a comment to Wilson, and the two turned and began walking towards the exit for the airport. The officers approached Wilson and Wiley as they arrived at the exit door and began questioning them. Davis asked Wilson if he could search her bag and she consented. He found a nylon bag containing $24,510.00. When questioned, Wiley and Wilson both denied being the owners of the money. The officers seized the cash.

On August 4, 1997, Sheila Anderson, a narcotics agent employed by the Terrebonne Parish Sheriff's Department, received a telephone call from a Western Union

---

[13]*See* State rec., vol. 5 of 7, p. 993, lines 19-21. The airport, which at the time of petitioner's trial was referred to as New Orleans International Airport, is presently known as Louis Armstrong International Airport.

employee informing her that Wiley had been sending substantial amounts of money to California on a regular basis. Agent Anderson subpoenaed the records of Western Union for transactions made by Wiley. Anderson's investigation revealed that from June 6, 1996 through July 15, 1997, Wiley had sent a total of $108,650.00 from Houma, Louisiana, to California. The money had been sent in Wiley's name, as well as in the name of three women, Karonda Lyons, Sarah Kirby, and Miyah Riddle.

After receiving this information, Agent Anderson placed Wiley under surveillance to determine where he worked, lived and frequented. Anderson was later informed about the incident at the airport when Wiley was detained by Jefferson Parish officials. Anderson also received a call from a man who was concerned about the activity and the safety of his stepdaughter, Miyah Riddle, one of the suspects in the investigation. Agent Anderson additionally learned from one of the officers in the interdiction unit at the New Orleans airport that Sarah Kirby, one of the suspects whose name was used in the Western Union transactions, was on an airplane to California. Anderson's investigation revealed a pattern where the suspects would travel by airplane from Louisiana to California and then would return to Louisiana by train to make transactions. Based on Agent Anderson's knowledge about defendant and the three suspects in whose names money had been sent to California by Western Union, the agent's office decided to conduct an interdiction at the train station in Shriever, Louisiana.

In February 1998, after boarding the train in New Iberia, Louisiana, and determining that Sarah Kirby was on board, Agent Anderson contacted her office and informed the other officers involved in the interdiction.  Once the train reached Shriever, Louisiana, Kirby exited the train with a piece of luggage.  Wiley was waiting for Kirby at the train station.  Kirby departed the train and went to Wiley's vehicle, placing the luggage in his vehicle.  The interdicting officers approached the vehicle, along with a narcotics detector dog, whose response to the odor emitting from Kirby's bag indicated to officers that drugs were present.  Wiley and Kirby were arrested.

The officers took the bag into custody and transported it to the narcotics office.  When the officers opened the bag, it contained a large package wrapped in newspaper print from a California newspaper.  Inside the newspaper was Saran Wrap which contained a substance later confirmed to be marijuana.    Pursuant to a subsequent search of Wiley's home, law enforcement officials uncovered a gun.

**STANDARD OF REVIEW**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") includes a comprehensive overhaul of federal habeas corpus legislation, including 28 U.S.C. § 2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law and mixed questions of fact and law where there has been an adjudication on the merits in State court proceedings.

State court determinations of questions of law and mixed questions of law and fact are reviewed under 28 U.S.C. § 2254(d)(1) and receive deference unless they were "contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).  The United States Supreme Court has advised that:

> Under the "contrary to" clause, a federal habeas corpus court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 1056, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000); *Hill*, 210 F.3d at 485.  Questions of fact found by the state court are "presumed to be correct ... and we will give deference to the state court's decision unless it `was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Hill*, 210 F.3d at 485, *quoting* 28 U.S.C.§ 2254(d)(2).

## ANALYSIS

### A.  Suppression of Evidence

Wiley argues that his Fourth Amendment rights were violated by virtue of the trial court's failure to suppress evidence obtained as a result of a pin register order which

allowed law enforcement officials to record all telephone numbers dialed from Wiley's telephone, along with the numbers for telephones from which calls to Wiley were initiated. Wiley claims his Fourth Amendment rights were further violated when the trial court failed to suppress evidence concerning his detainment at New Orleans International Airport and the subsequent seizure of a significant amount of cash discovered in his companion's carry-on luggage. Both of these claims were raised in connection with Wiley's state direct appeal proceedings and both claims were denied on the merits by the Louisiana First Circuit Court of Appeal.[14]

Wiley's ability to obtain federal habeas corpus relief with regard to an alleged Fourth Amendment violation is greatly limited by the United States Supreme Court's decision in *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). In *Stone*, the United States Supreme Court held that a state prisoner is not entitled to federal habeas relief on the ground that evidence obtained in an unconstitutional manner was introduced at trial as long as the State provided "an opportunity for full and fair litigation" of his Fourth Amendment claim. *Id*. at 3052. *See also Davis v. Blackburn*, 803 F.2d 1371, 1372 (5th Cir. 1986). A review of the state record in this matter reflects that such an opportunity was afforded to Wiley, a hearing having been conducted before the state trial court on January 7, 1999, with respect to both his motion to suppress the evidence obtained as a result of the

---

[14]*See* State rec., vol. 7 of 7, pp.1698-1702.

pin register order and his motion to suppress the evidence associated with his allegedly illegal airport detainment.[15]

Further, regarding the pin register order, the basis of Wiley's Fourth Amendment claim is that the order, though not violative of the "federal constitution", was violative of "[t]he Louisiana Constitution, Louisiana Statutes and [the] jurisprudence of this state", all of which "afford citizens greater protection tha[n] that afforded under the federal system."[16] The law is clear, however, that a violation of state law is irrelevant for purposes of attaining federal habeas corpus relief. Habeas review is limited to questions of constitutional dimension. *See generally Jernigan v. Collins*, 980 F.2d 292, 298 (5th Cir. 1992), *cert. denied*, 508 U.S. 978, 113 S.Ct. 2977, 125 L.Ed.2d 675 (1993); *Castillo v. Johnson*, 141 F.3d 218, 222 and 224 (5th Cir.), *cert. denied*, 524 U.S. 979, 119 S.Ct. 28, 141 L.Ed.2d 788 (1998).[17]

### B. Insufficiency of Evidence Reflecting Possession of Firearm and General Intent to Commit Offense

---

[15]*See* State rec., vol. 3 of 7, pp. 331, 334-335.

[16]*See* Federal rec., doc. 1, Wiley's "Brief in Support of Petition for Writ of Habeas Corpus" at p. 5.

[17]The court further notes that Wiley's claim is not actionable in light of the fact, as the state appellate court pointed out, that the evidence obtained as a result of the pin register order "was not introduced or used at trial." *See* State rec., vol. 7 of 7, p. 1699.

Under Louisiana law, "[t]o convict a defendant of illegal possession of a firearm by a convicted felon, the State must prove the following elements beyond a reasonable doubt: (1) possession of a firearm; (2) conviction of an enumerated felony ; (3) absence of the ten-year statutory period of limitation; and (4) general intent to commit the offense." *State v. Ware*, 795 So.2d 495, 499 (La. App. 5 Cir. 2001), *citing* LSA-R.S. 14:95.1; *State v. Husband*, 437 So.2d 269, 271 (La. 1983). Wiley contends that the State submitted insufficient evidence to satisfy elements (1) and (4).

When conducting a post-AEDPA sufficiency of the evidence review, a federal court may grant relief only if it determines that the state court decision rested on an "unreasonable application" of clearly established Federal law, as determined by the Supreme Court, to the facts of the case. *See* 28 U.S.C. § 2254 (d)(1). In its analysis of the instant claim, the Louisiana First Circuit Court of Appeal, in addressing the merits in connection with Wiley's direct appeal, first set forth the applicable standard of review, based upon the Supreme Court's decision in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).[18]

---

[18]Wiley also set forth the instant claim in his state post-conviction application. On post-conviction, the Louisiana First Circuit denied Wiley's claim pursuant to La.C.Cr.P. art. 930.4(A) because the matter had been raised and fully reviewed on direct appeal. *See* discussion *supra* at p. 3. While a state court's reliance on a state procedural rule to deny a petitioner's constitutional claim generally bars federal habeas corpus relief, *see* discussion *infra* at pp. 23-24, a claim denied pursuant to La.C.Cr.P. art. 930.4(A) represents an exception to this general rule. *See Bennett v. Whitley*, 41 F.3d 1581, 1583 (5th Cir. 1994) (Article 930.4(A) "is not a procedural bar in the traditional sense"

In addressing a challenge to the sufficiency of the evidence, the reviewing court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See* La. C.Cr.P. art. 821; *State v. Fisher*, 95-0430, p. 2 (La. App. 1st Cir. 5/10/96), 673 So.2d 721, 723, *writ denied*, 96-1412 (La. 11/1/96), 681 So.2d 1259; *State v. Mussall*, 523 So.2d 1305, 1308-09 (La. 1988), *citing Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). It is well settled that the trier of fact may accept or reject, in whole or in part, the testimony of any witness. Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of witnesses, the matter is one which goes to the weight of the evidence, not its sufficiency. *State v. Breitung*, 623 So.2d 23, 26 (La. App. 1st Cir.), *writ denied*, 626 So.2d 1168 (La. 1993). The reviewing court must defer to the actual trier of fact's rational credibility calls, evidence weighing, and inference drawing. *State v. Mussall*, 523 So.2d at 1311.

Additionally, La. R.S. 15:438 provides that when evidence is circumstantial, the applicable rule is "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." In *State v. Rosiere*, 488 So.2d 965, 968 (La. 1986), the Louisiana Supreme Court explained:

> This is not a purely separate test from the *Jackson* sufficiency standard to be applied instead of a sufficiency of the evidence test whenever circumstantial evidence forms the basis of the conviction. Ultimately, all evidence, both direct and circumstantial, must be sufficient under *Jackson* to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. Due process requires no greater burden. (Citations omitted..)

*State v. Wiley*, 2000 KA 0782 (La. App. 1 Cir. 2001) (unpublished opinion).

---

and therefore, does not bar federal habeas corpus review.); *Bell v. Cain*, 2002 WL 31002831, *9 n.37, *citing Bennett, supra* ("A claim denied pursuant to La.C.Cr.P. art. 930.4(A) is not procedurally barred in a federal habeas corpus proceeding."). Accordingly, a review of the instant claim on the merits is appropriate.

Next, the Louisiana First Circuit examined what the State was required to show.

> La. R.S. 14:95.1 makes it unlawful for certain felons "to possess a firearm." The statute does not make "actual" possession a necessary element of the offense or specifically require that the defendant have the firearm on his person to be in violation. "Constructive" possession satisfies the possessory element of the offense. *State v. Day*, 410 So.2d 741, 743 (La. 1982). Constructive possession occurs when the firearm is subject to the offender's dominion and control. Dominion and control over a weapon is sufficient to constitute constructive possession even if the control is only temporary in nature and even if the control is shared with another person. *State v. Fisher*, 94-2255, p. 4 (La. App. 1st Cir. 12/15/95), 669 So.2d 460, 462, *writ denied*, 96-0958 (La. 9/20/96), 679 So.2d 432.

*State v.* Wiley, 2000 KA 0782 (La. App. 1 Cir. 2001) (unpublished opinion).

The Louisiana First Circuit then examined the evidence presented at trial. Karonda Lyons, Wiley's girlfriend, testified that Wiley lived with her in a rental home during the pertinent time period.[19] Terrebonne Parish Sheriff Deputy Derrick Collins testified that pursuant to a warrant, he, along with other officials, conducted a search of the rental home which Wiley shared with Karonda Lyons.[20] During this search, Collins discovered a loaded gun located in their bedroom.[21] Lyons acknowledged that a gun was discovered in the house

---

[19]*See* State rec., vol. 5 of 7, p. 1010, lines 5-19.

[20]*See* State rec., vol. 5 of 7, p. 1033, lines 6-30.

[21]*See* State rec., vol. 5 of 7, p. 1034, lines 1-28.

she shared with Wiley and informed that the gun did not belong to her.  When questioned as to who the gun belonged to, she surmised that it must have belonged to Wiley.  Specifically, the trial transcript reflects the following exchange between the prosecutor and Lyons:

Q.  Do you know whether or not a gun was found in your house ...?
A.  Yes.
Q.  A gun was found?
A.  Yes, sir.
Q.  Was that your gun?
A.  No, sir.
Q.  Whose gun was it?
A.  I guess his.[22]

Wiley argues that the above evidence was insufficient to support his gun possession conviction because "the [S]tate failed to prove beyond a reasonable doubt that [he was] aware that a gun was in the home of Ms. Lyons, within which, [he] had also taken residence."  According to Wiley, "awareness [is an] intangible[] that overlaps into both the possession and intent elements of La. R.S. 14:95.1." Wiley states that "awareness must exist to have intent", and in support of his position, he cites the following cases: *State v. Lewis*, 535 So.2d 943 (La. App. 2 Cir. 1988); *State v. Fisher*, 669 So.2d 460 (La. App. 1 Cir. 1995); *State v. Heacox*, 543 So.2d 101 (La. App. 3 Cir. 1989); and, *State v. Lamothe*, 738 So.2d 55

_____

[22]*See* State rec., vol. 5 of 7, p. 1014, lines 4-12.

14

(La. App. 5 Cir. 1999).[23]  A review of these cases, along with others, reflects that the issue as to what constitutes sufficient evidence to support a firearm possession conviction generally "depends on the particular facts of the case."  *State v. Ware*, 795 So.2d 495, 499 (La. App. 5 Cir. 2001), *citing State v. Trahan*, 425 So.2d 1222, 1226 (La. 1983); *see also State v. Heacox*, 543 So.2d 101, 106 (La. App 3 Cir. 1989), *citing State v. Walker*, 514 So.2d 602 (La. App. 4 Cir. 1987) and *Trahan, supra.*

In *Heacox*, *Fisher*, and *Lamothe*, all cases in which the respective defendants successfully argued that there was insufficient evidence to support their convictions, the firearms at issue belonged to a third party and were not uncovered in an area over which the defendant had dominion and control.  In *Heacox*, the firearm was discovered in a truck which was not owned by or being driven by the defendant.  Instead, the defendant was a passenger and the gun belonged to the driver's mother.  The Louisiana Third Circuit Court of Appeal reversed Heacox's conviction, reasoning that the evidence reflected "mere acquiescence", on the part of Heacox, "to the fact that [the driver] had a gun in his truck.  The gun was not found on his person or found in or on property over which he had dominion and control."

---

[23]*See* Federal rec., doc. 1, Wiley's "Brief in Support of Petition for Writ of Habeas Corpus" at pp. 25- 26.  Wiley also cites *State v. Woods*, 654 So.2d 809 (La. App. 4 Cir. 1995), in support of his position.  However, the matter at issue in *Woods* was not one of insufficiency of evidence, but rather, whether defendant's prior guilty plea to the charge of simple possession of cocaine precluded his later prosecution on the charge of possession of a firearm while in possession of a controlled dangerous substance based upon the constitutional prohibition against double jeopardy.

*Heacox*, 543 So.2d at 106.  In *Fisher*, the firearm was uncovered in the defendant's sister's

purse after a consent search of the vehicle defendant was driving.  The evidence reflected

that the defendant knew his sister had a gun in her purse, and a pat down search revealed that

defendant had a clip for the gun in his pocket.  However, the Louisiana First Circuit reversed

defendant's conviction based upon the fact that the evidence disclosed no intent on the part

of defendant to possess the gun, but rather, a "mere acquiescence to the fact his sister owned

a gun and had the gun in her purse." *Fisher*, 669 So.2d at 462.  In *Lamothe*, defendant,

Terence McNabb, was driving a vehicle owned by his mother, and co-defendant, Kirk

Lamothe, was a passenger in the vehicle.  After making a stop, an argument ensued between

McNabb and a third-party, Daniel Washington.  This argument ultimately led to an exchange

of gunfire between Lamothe and Washington.  The gun used by Lamothe was recovered on

the ground near the vehicle.  Lamothe testified that he retrieved the gun from the vehicle,

specifically, from under the driver's seat.  When questioned as to whether McNabb had told

him the gun was under the driver's seat, Lamothe responded: "I just knew he had it." *State

v. Lamothe*, 715 So.2d 708, 713 (La. App. 5 Cir. 1998).[24]  The Louisiana Fifth Circuit

---

[24]The applicable facts are set forth in the Louisiana Fifth Circuit's original opinion, *State v. Lamothe*, 715 So.2d 708, rendered June 30, 1998. On November 25, 1998, the Louisiana Supreme Court remanded the matter with respect to defendant McNabb, directing that the Fifth Circuit consider whether co-defendant Lamothe's statement, which the state appellate court determined should not have been admitted to the jury, when coupled with "the other evidence presented at trial", was sufficient to support the jury's finding that McNabb, a convicted felon, was unlawfully in possession of a firearm. *See State v. Lamothe*, 722 So.2d 987 (La. 1998).

16

concluded that the above evidence was insufficient to support McNabb's conviction for illegal possession of a firearm, reasoning: "Lamothe's statement merely places the gun in the car with McNabb. However, ... mere presence in an area where a firearm is found, or mere association with an individual found to be in possession of a firearm, does not necessarily establish possession." *State v. Lamothe*, 738 So.2d 55, 57 (La. App. 5 Cir. 1999).

In contrast to the above cases, in situations where "a gun is found in an area that the defendant has customarily occupied, the courts have generally found this to be evidence of constructive possession" and have upheld the conviction. *Ware*, 795 So.2d at 500. Courts have reached this conclusion despite the submission of evidence to the effect that immediately preceding the discovery of the firearm, the defendant had not, in fact, resided in the residence or in the particular room where the firearm was uncovered.

In *State v. Jackson*, 712 So.2d 934, 937 (La. App. 5 Cir. 1998), during the search of a home belonging to Beverly Jackson, defendant's mother, a gun was recovered from the bedroom occupied by defendant. While Ms. Jackson stated that she did "not own the gun found at her house", she also stated "that defendant [had] not, to her knowledge, possessed a gun since his release from prison." *Id.* Ms. Jackson further testified that several friends and relatives had recently stayed at her house and "[s]ome of these people had stayed in defendant's room." *Id.* Despite this evidence, the Louisiana Fifth Circuit Court of Appeal upheld defendant's conviction for illegal possession of a firearm, reasoning that "[t]he jury

17

apparently gave little credence to the defense testimony" and could "reasonably conclude[],

based on the evidence, that defendant had possession of the pistol." *Id*. at 938. In *State v.*

*Lewis*, 535 So.2d 943 (La. App. 2 Cir. 1989), firearms were discovered in the home

defendant shared with his wife. Defendant, however, immediately prior to the discovery of

the guns, had not resided in the house, having been traveling out of town. Defendant argued

"that since he was out of town ... and there [was] no direct evidence of his actual control over

any of the guns, the jury had no basis for finding that he was in actual or constructive

possession of any of the weapons." *Id*. at 949. The Louisiana Second Circuit Court of

Appeal, however, disagreed, noting that "[t]he jury was entitled to and did reject defendant's

alibi evidence." *Id*. at 950. Similarly, in *State v. Ware*, 795 So.2d 495, 498 (La. App. 5 Cir.

2001), pursuant to an eviction proceeding, a home leased by defendant and his wife was

searched and a gun was uncovered from defendant's closet. Defendant claimed that he no

longer lived in the house and therefore, was not in possession of the gun. The Louisiana

Fifth Circuit, however, upheld defendant's conviction, noting that "the jury made a

credibility determination" and obviously rejected the testimony offered on behalf of the

defense. *Id*. at 501.

        In the instant matter, it is undisputed that a gun was discovered in the bedroom

Wiley shared with his girlfriend, Lyons. Lyons testified that the gun did not belong to her

18

and therefore, must have belonged to Wiley.[25]  Wiley offered no contradictory testimony.

Clearly, viewing the above evidence in a light most favorable to the prosecution, a rational

trier of fact could have found the requisite possession and intent, elements (1) and (4), for

purposes of finding that Wiley violated LSA-R.S. 14:95.1.

### C. Insufficiency of Evidence Reflecting Conviction of Prior Felony and Unconstitutional Admission of Other Crime Evidence

As noted above, an element which must be shown in order to convict a

defendant of violating LSA-R.S. 14:95.1 is that the defendant has a prior felony conviction.

In this case, the State had evidence that a person using the name, Andre Wilson, had an

earlier felony conviction for possession of cocaine and, according to the State, Marvin Wiley

and Andre Wilson were the same person. Wiley, however, refused to stipulate to the fact that

he was also known as Andre Wilson and a comparison of Wiley's fingerprints with the

fingerprints of the person calling himself Andre Wilson who had earlier been convicted of

cocaine possession was not possible since the record associated with the earlier drug

conviction did not contain fingerprints. Therefore, the State introduce into evidence a record

of an earlier, unrelated arrest of Andre Wilson which contained Wilson's fingerprints.  A

subsequent comparison of said fingerprints with Wiley's fingerprints reflected that Wiley and

---

[25]*See supra* at pp. 13-14 for Lyons' testimony.

19

Wilson were, in fact, the same person.

Wiley argues that evidence of his earlier, unrelated arrest under the name of Andre Wilson should not have been admitted. The trial court's action in allowing such evidence, according to Wiley, constituted a violation of his rights under the Fifth and Fourteenth Amendments. Wiley further contends that with evidence of his earlier, unrelated arrest properly excluded, there is nothing linking him with the prior possession of cocaine felony conviction. As such, there was insufficient evidence to support his conviction for being a prior felon illegally in possession of a firearm.

It is well-established that federal courts possess only limited authority to consider state evidentiary determinations in a state prisoner's habeas proceeding. *Burgett v. Texas*, 389 U.S. 109, 113-14, 88 S.Ct. 258, 260-61, 19 L.Ed.2d 319 (1967). When undergoing such an analysis, a showing must be made that the evidentiary ruling constituted an error under the pertinent state law. *Robinson v. Whitley*, 2 F.3d 562, 566 (5th Cir. 1993), *cert. denied*, 510 U.S. 1167, 114 S.Ct. 1197, 127 L.Ed.2d 546 (1994). As shown by virtue of the Louisiana First Circuit's analysis, set forth below, the pertinent "other crime" evidence was properly admitted under Louisiana law and therefore, sufficient evidence reflecting that Wiley was, in fact, a prior felony offender, having earlier been convicted on the felony charge of possession of cocaine, was submitted for purposes of proving a violation of LSA-R.S. 14:95.1.

Louisiana Code of Evidence article 404(B)(1) provides:

> Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, **identity**, absence of mistake or accident, ... or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding. [Emphasis added.]

Evidence of other crimes or bad acts generally is not admissible; however, when such evidence tends to prove a material issue and has independent relevance other than showing that a defendant is of bad character, it may be admitted by certain statutory and jurisprudential exceptions to this exclusionary rule. *State v. Silguero*, 608 So.2d 627, 629 (La. 1992). One of the above-enumerated factors must be at issue, have some independent relevance or be an element of the crime charged in order for the evidence to be admissible. *State v. Jackson*, 625 So.2d 146, 149 (La. 1993). The requirements for admission of such evidence, set forth in *State v. Prieur*, 277 So.2d 126, 130 (La. 1973), must be met. Upon the defendant's request, within a reasonable time before trial, the state must furnish to the defendant a written statement of the acts or offenses it intends to offer, describing same with the general particularity required of an indictment or information. In the written statement, the state must specify the exception to the general exclusionary rule upon which it relies for the admissibility of the evidence of other acts or offenses.

Since the evidence was admitted to identify Marvin Wiley and Andre Wilson as the same person, it falls within one of the exceptions of Code of Evidence article 404 (B)(1), i.e., identity. This evidence was admitted for that limited purpose. Due to the unique circumstances in this case, the trial court gave defendant the option to admit he was Wilson, in order to prevent the admissibility of the evidence, otherwise, the booking evidence was to be allowed for the limited purpose of identification, but the defendant declined to stipulate to that fact. In addition, the court informed the jury of the limited purpose of admission of this evidence by stating, "Ladies and gentlemen, I need to admonish you though, that these documents are being admitted solely for the purpose of identification purposes. You should draw no other

21

inferences from [this evidence] being introduced."

       We also note that [the pertinent evidence] did not state a particular charge for which Andre Wilson had been arrested. Since the evidence was introduced for the limited purpose of establishing identity, we conclude defendant was not unfairly prejudiced by its admission.

*State v. Wiley*, 2000 KA 0782 (La. App. 1 Cir. 2001) (unpublished opinion). Thereafter, in a footnote, the Louisiana First Circuit also rejected the additional claim, raised in the instant habeas action, that the State violated *Prieur, supra*, by failing to provide defendant with pre-trial notice of its intent to introduce "other crime" evidence.[26] The basis of the court's rejection was Wiley's failure to object at trial to the lack of notice as required under *Prieur*. The court reasoned:

> We note that defendant did not object to the state's failure to provide a *Prieur* notice, and the record establishes that defendant did not file a motion for discovery requesting a *Prieur* notice. According to C.Cr.P. art. 720, the court is required to order the district attorney to inform defendant of the state's intent to offer evidence of other crimes upon motion of defendant. *See also* La. C.E. art. 404(B)(1). Since defendant did not request notice, and did not timely object to the lack of *Prieur* notice, it is waived.

*Id.*

       Even if the trial court's evidentiary decision had constituted a violation of state law, Wiley, nevertheless, would not have been entitled to habeas corpus relief absent a

---

[26]*See* Federal rec., doc. 1, Wiley's "Brief in Support of Petition for Writ of Habeas Corpus" at pp. 12-13.

constitutional violation. Such a showing is made in the context of a state evidentiary ruling only when "the petitioner can show a 'reasonable probability' that the erroneous ruling affected the outcome of the trial." *Johnson v. Dormire*, 2005 WL 2298185, *8 (E.D. Missouri, Sept. 21, 2005), *citing Troupe v. Groose*, 72 F.3d 75, 76 (8th Cir. 1995). The significance of the evidentiary ruling at issue in this case was greatly limited by virtue of the trial court's instruction to the jury that the "other crime" evidence was to be considered for identification purposes only. Accordingly, the court finds it did not affect the outcome of Wiley's trial.

### D. Insufficiency of Evidence to Support Racketeering Conviction

Wiley argues that there was insufficient evidence to support his racketeering conviction. Wiley raised this same claim in connection with his state post-conviction application. However, the Louisiana First Circuit Court of Appeal refused to consider the merits due to Wiley's failure, as required under Louisiana Court of Appeal Rule 4-5, "to attach the necessary documentation, including the [trial] court's ruling on his application and any pertinent transcripts".[27] Based upon this decision, the State argues that the instant claim is "procedurally defaulted."[28]

---

[27]A copy of the Louisiana First Circuit's opinion, *State ex rel. Wiley v. State*, 2003 KW 0241 (La. App. 1 Cir. 2003) (unpublished opinion), is contained in the State rec., vol. 2 of 7, p. 225.

[28]*See* Federal rec., doc. # 5, "State's Answer to Applicant's Petition for Writ of Habeas Corpus" at p. 12.

Generally, a federal court will not review a federal habeas claim decided by a state court if the decision of that state court rests on a state ground that is both independent of the merits of the federal claim and adequate to support that judgment. *Amos v. Scott*, 61 F.3d 333, 338 (5th Cir.), *cert. denied*, 516 U.S. 1005, 116 S.Ct. 557, 133 L.Ed.2d 458 (1995), *citing Harris v. Reed*, 489 U.S. 255, 262, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308 (1989). This "independent and adequate state law" doctrine applies to both substantive and procedural grounds and affects federal review of claims that are raised on either direct or habeas review. *Amos*, 61 F.3d at 338 (citations omitted). As explained in *Coleman v. Thompson*, 501 U.S. 722, 730-31, 111 S.Ct. 2546, 2554, 115 L.Ed .2d 640 (1991): "In the habeas context, the application of the independent and adequate state ground doctrine is grounded in concerns of comity.... Without the rule, ... habeas would offer state prisoners whose custody was supported by independent and adequate state grounds ... means to undermine the State's interest in enforcing its laws."

In order to fulfill the independence requirement of the above-described doctrine, the last state court rendering a judgment in the case must "clearly and expressly" indicate that its judgment is independent of federal law and rests on a state procedural bar. *Amos*, 61 F.3d at 338; *Harris*, 489 U.S. at 263, 109 S.Ct. at 1043. When the last state court judgment does not indicate whether it is based on procedural default or the merits of a federal claim, the federal court will presume that the state court has relied upon the same grounds

24

as the last **reasoned** state court opinion. *Ylst v. Nunnemaker*, 501 U.S. 797, 802, 111 S.Ct. 2590, 2594, 115 L.Ed.2d 706 (1991) (emphasis added).

With respect to the instant issue, the Louisiana First Circuit Court of Appeal issued the last reasoned opinion. As set forth above, the state appellate court denied petitioner's claim due to his failure to attach necessary documentation as required under Louisiana Court of Appeal Rule 4-5.

Given the fact that in its ruling the Louisiana First Circuit clearly relied upon a state procedural bar in rejecting petitioner's claim, the "independent" requirement has been satisfied. Next, the court must determine whether or not this independent procedural bar is also "adequate."

A procedural bar is "adequate" if it is applied "strictly or regularly" to the "vast majority of similar claims." *Glover v. Cain*, 128 F.3d 900, 902 (5th Cir.1997), *cert. denied*, 523 U.S. 1125, 118 S.Ct. 1811, 140 L.Ed.2d 949 (1998); *Amos*, 61 F.3d at 339. A state procedural rule enjoys a presumption of adequacy when the state court expressly relies upon it in deciding not to review a claim for collateral relief. *Glover*, 128 F.3d at 902. The burden is on petitioner to establish that the state's procedural bar rule was not strictly and regularly followed at the time it was applied to bar his claim. *See Martin v. Maxey*, 98 F.3d 844, 847 (5th Cir.1996), *citing Sones v. Hargett*, 61 F.3d 410, 416 (5th Cir.1995).

A state fails to strictly and regularly apply a procedural rule only when the state "clearly and unequivocally excuse[s] the procedural default." *Id.*, *citing Amos*, 61 F.3d at 342. Moreover, the state must fail to apply the rule to claims "identical or similar " to the petitioner's claim. *Amos*, 61 F.3d at 341. *De minimis* exceptions will not preclude the state from asserting the procedural default doctrine; "an occasional act of grace by a state court in excusing or disregarding the state procedural bar rule does not render the rule inadequate." *Maxey*, 98 F.3d at 848, *citing Amos*, 61 F.3d at 342.

In the instant matter, Wiley has failed to satisfy his burden of showing that the pertinent procedural bar was not strictly and regularly followed at the time it was applied to bar his claim. However, even assuming that his insufficiency claim, in connection with his racketeering conviction, was not procedurally barred, Wiley would nevertheless not be entitled to habeas corpus relief since his claim is without merit.

The Louisiana Racketeering Act, set forth in LSA-R.S. 15:1351-1356, provides in pertinent part: "It is unlawful for any person employed by, or associated with any enterprise knowingly to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity." LSA-R.S. 15:1353(C). "Racketeering activity" is defined, under LSA-R.S. 15:1352(A), as "committing, attempting to commit, conspiring to commit, or soliciting, coercing, or intimidating another person to commit" a crime punishable under certain criminal statutes, the pertinent one in this case being La.R.S.

26

40:966(A) which makes it unlawful for a person to knowingly or intentionally distribute, dispense, or possess with the intent to distribute or dispense marijuana. "'Pattern of racketeering activity' means engaging in at least two incidents of racketeering activity that have the same or similar intents, results, principals, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents...." LSA-R.S. 15:1352(C). "Enterprise" is defined as "any individual, sole proprietorship, partnership, corporation or other legal entity, or any unchartered association, or group of individuals associated in fact and includes unlawful as well as lawful enterprises and governmental as well as other entities." LSA-R.S. 15:1352(B).

Wiley claims that the State failed to submit sufficient evidence to prove that he was associated with an "enterprise" as required under LSA-R.S. 15:1353(C). In support of his claim, Wiley relies upon *State v. Touchet*, 759 So.2d 194 (La. App. 3 Cir. 2000), a case he describes as "almost factually identical to the instant case."[29]

In *Touchet*, the alleged "enterprise" at issue involved the transportation of marijuana from Texas to Louisiana. The evidence reflected that Texan, David Camacho, along with other Texas suppliers, provided marijuana to fellow Texans, Monty Williams and his wife, Melissa, who, in turn, provided it to Louisianian, William "Billy" Walton. Walton

---

[29]*See* Federal rec., doc. 6, "Brief in Support of Motion to Expand the Record to Proceedings under Docket No: 04-2378" at p. 10.

27

then passed the marijuana on to defendant, Terry Touchet, who would sell it, consume it, or give it away in Louisiana. None of these individuals were in charge of or oversaw the entire transport operation described above. Telephone records reflected that the initial Texas supplier, Camacho, was in contact with the Texas "middle-man", Williams, that Williams was in contact with Walton, the Louisiana "middle man", and that Walton was in contact with Touchet. The trial testimony of Monty and Melissa Williams, along with Billy Walton, confirmed that Touchet did not know the Williams, that his sole contact in the operation was Walton.

Based upon the tremulous connection between the parties, the Louisiana Third Circuit determined that an "enterprise" did not exist and reversed Touchet's racketeering conviction. The court reasoned: "[T]he evidence did not show that the co-defendants' association, or alleged 'enterprise,' was an independent entity with members functioning as a continuing unit with a decision making structure". *Touchet*, 759 So.2d at 199.

In contrast with *Touchet*, a completely different conclusion was reached by the Louisiana Fifth Circuit Court of Appeal in *State v. Sarrio*, 803 So.2d 212 (La. App. 5 Cir. 2001), *writ denied*, 836 So.2d 86 (La. 2003). In *Sarrio*, as in *Touchet*, the "enterprise" at issue involved the transport and sale of marijuana. However, as the Louisiana Fifth Circuit specifically noted, the facts in *Sarrio* "are clearly distinguishable from those in ... *Touchet*". *Sarrio*, 803 So.2d at 226.

Unlike in *Touchet*, the transport and sale of marijuana at issue in *Sarrio* was not accomplished by a disjointed group of individuals over whom no person or persons exercised control. Instead, the business was systematically conducted by virtue of a system contrived by defendant, Roy Sarrio. Sarrio controlled the means and personnel by which the marijuana was procured, transported, and ultimately distributed. As explained below:

> William Chauncey was a cab driver who became a courier for the head of the operation, Roy Sarrio. Chauncey, who initially transported people for Sarrio, later transported packages of marijuana for him in return for money. Roy Sarrio gave him the drugs and he was instructed where to deliver them by Sarrio. On April 29, 1996, he was given a one-pound delivery to take to Keith Marcel, the front for the operation.

> A second member of the operation, Charles McGehee, testified that he "moved marijuana around" for Roy Sarrio. As illustrative of his involvement, this witness testified regarding a transaction that occurred in May 1996. McGehee indicated that he was with Roy Sarrio when Sarrio arranged for a 400-500 pound delivery from a group of Mexicans. McGehee helped Sarrio pick up the delivery and bring it to Tonya Sarrio's house for storage. Thereafter, Sarrio instructed McGehee to pick up Marcel at the Burger King and meet him at the body shop where Sarrio would be given a delivery of drugs. He was then directed to take Marcel and the drugs for delivery to undercover agent Harrison who was waiting at Marcel's house....

> [Sarrio's] wife, [Tonya,] ... indicated that her husband stored his drugs and drug money at her house on Oak Street....

> Keith Marcel, who was billed as a co-defendant with Roy Sarrio in this case, ... indicated that he had been a friend of Roy Sarrio for six years and was recruited for the drug business by Sarrio. Marcel recounted at least six drug sales and four of those were with Roy Sarrio. Concerning his involvement with Roy Sarrio, Marcel indicated that Sarrio supplied the drugs, set the terms for the sale and received the money from the sales....

*Sarrio*, 803 So.2d at 226-227.

Based upon the above, the Louisiana Fifth Circuit determined that an "enterprise", as required under the racketeering statute, did exist. Sarrio acted as the "management head" of the enterprise, procuring the drugs to be sold, setting the price, setting the quantity to be sold, receiving the proceeds, and paying the participants. *Id.* at 227.

Similarly, in the instant action, Wiley, along with his co-defendant, Reginald Johnson, acted as the "management head" of an enterprise which systematically transported approximately $110,000.00 worth of marijuana from California to Louisiana.[30] As reflected by the testimony of the enterprise's "employees", Wiley and Johnson controlled every aspect of the pertinent drug transport business.

Sarah Kirby, a Louisiana resident, testified that Wiley recruited her, asking if she would like to earn money bringing marijuana from California back to Louisiana.[31] Kirby estimated that at Wiley's direction, she made "10 to 12" trips to California from Louisiana and back, transporting marijuana.[32] Kirby, at Wiley's direction, also wired money on several occasions from Louisiana to California.[33] Kirby even assisted Wiley in recruiting personnel

---

[30]*See* State rec., vol. 5 of 7, pp. 972-973, testimony of Terrebonne Parish Narcotics Agent Shelia Anderson.

[31]*See* State rec., vol. 5 of 7, p. 1108.

[32]*See* State rec., vol. 5 of 7, pp. 1109, 1113-1114..

[33]*See* State rec., vol. 5 of 7, pp. 1109-1113.

for the business. She testified that she approached Miyah Riddle, requesting that Riddle travel to California, which Riddle did, returning to Louisiana with marijuana.[34] Thereafter, pursuant to Wiley's direction, Riddle wired funds to California.[35]

Ilysah King, a California resident, testified that she was recruited by Reginald Johnson for the purpose of receiving money for him wired from Louisiana by Wiley. King received, on behalf of Johnson, approximately 27 money wire transfers.[36] Correspondingly, Wiley recruited his girlfriend, Karonda Lyons, to send, on his behalf, money wire transfers to California, many of which were presumably picked up by King.[37]

Another Louisiana resident, Shenikqual Wilson, testified that Marvin Wiley hired her to make trips to California for him.[38] She ultimately made two such trips, bringing packages containing marijuana from California to Louisiana. For each of these trips, Wiley paid her approximately $600.00.[39] Wilson testified that at Wiley's behest, she attempted a third trip to California. She was to transport a green bag which Wiley placed in her carry-on

---

[34]*See* State rec., vol. 5 of 7, pp. 1060-1063.

[35]*See* State rec., vol. 5 of 7, pp. 1064-1065.

[36]*See* State rec., vol. 5 of 7, pp. 1126-1141.

[37]*See* State rec., vol. 5 of 7, pp. 1011-1012.

[38]*See* State rec., vol. 5 of 7, p. 1030.

[39]*See* State rec., vol. 5 of 7, pp. 1040-1044.

31

---

suitcase and deliver it to Reginald Johnson. She, however, never made that trip. Police detained her, along with Wiley, at the airport. A subsequent search revealed that the green bag, which Wiley had earlier placed in her carry-on suitcase, contained approximately $24,000.00.[40]

April Rogers, a second California recruit, testified that Reginald Johnson told her that he would pay her $1000.00 for bringing a suitcase, via train, from California to Louisiana. Upon her arrival in Louisiana, she was met by Marvin Wiley who promptly took the suitcase from her.[41] Upon her return to California, she once again met with Reginald Johnson who directed that she pick up a "money gram" for him.[42] Thereafter, she made a second train trip, carrying a suitcase containing marijuana from California to Louisiana. Rogers testified that this was her last trip since, while in the airport waiting to board a flight back to California, she was questioned by authorities.[43]

Based upon the above, the court finds that the transport and sale business organized and run by Wiley, along with his co-defendant, Reginald Johnson, is quite similar to the transport and sale business organized and run by Roy Sarrio. In contrast, it has very

---

[40]*See* State rec., vol. 5 of 7, pp. 1045-1046.

[41]*See* State rec., vol. 5 of 7, pp. 1088-1091.

[42]*See* State rec., vol. 5 of 7, pp. 1091-1092.

[43]*See* State rec., vol. 5 of 7, pp. 1092-1097.

little in common with the disjointed operation described in *Touchet*, *supra*.  Accordingly, viewing the evidence in a light most favorable to the prosecution, as required under *Jackson*, *supra,* the court finds that a rational trier of fact could have found that an "enterprise", as contemplated under the Louisiana Racketeering Act, existed.  As such, there was sufficient evidence to support Wiley's racketeering conviction.  Accordingly;

## RECOMMENDATION

It is hereby **RECOMMENDED** that the application for federal habeas corpus relief filed on behalf of petitioner, Marvin Wiley, be **DENIED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996).

New Orleans, Louisiana, this _____ day of _____, 2005.

LOUIS MOORE, JR.
United States Magistrate Judge

33